**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 10-60712-CIV-ZLOCH/ROSENBAUM
CONSENT CASE

JEANNINE V. DUCHATEAU,

      Plaintiff,

v.

CAMP DRESSER & MCKEE, INC.,

      Defendant.

_____/

**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

    This matter is before the Court on Defendant's Motion for Final Summary Judgment [D.E.

20]. The Court has carefully considered the Motion, Defendant's Statement of Undisputed Material

Facts [D.E. 19], Plaintiff's Opposition to Defendant's Motion [D.E. 26], Plaintiff's Response to

Defendant's Statement of Undisputed Material Facts [D.E. 26-2], and Defendant's Reply [D.E. 33],

as well as the declarations and deposition transcripts of various witnesses in this case. After a full

review, the Court finds that Defendant's Motion for Summary Judgment should be granted in part

and denied in part.

**I.      Material Facts**[1]

    Defendant Camp Dresser & McKee, Inc., ("CDM") provides consulting, engineering,

construction, and operation services for public and private clients in the United States and around

the world. *See* D.E. 19 at 1, ¶ 1. As pertinent here, these services include developing renewable-

---

    [1]The Court has set forth the material facts based on its review of Defendant's Statement of
Undisputed Material Facts [D.E. 19], Plaintiff's Response to that Statement [D.E. 26-2], and the
declarations and depositions of the parties' witnesses. In accordance with Local Rule 7.5(d), all
material facts set forth in Defendant's Statement and supported by evidence of record are deemed
admitted unless controverted by Plaintiff's Response.

energy management solutions. *See id.* at 1, ¶ 2. Plaintiff Jeannine V. DuChateau started working for CDM in 2007. *See id.* at 2, ¶ 3. DuChateau worked as a project lead in CDM's Management Consulting Division, first in Tampa and later in West Palm Beach. *See id.*

In early 2008, DuChateau and other CDM employees began working on "Go Green," a proposed environmental project for long-time CDM client Lockheed Martin ("Lockheed"). *See id.* at 2, ¶ 5. Go Green involved plans for Lockheed to improve conservation of resources, engage in recycling efforts, and conduct other environmental activities at its domestic facilities. *See id.* Throughout 2008, DuChateau was being considered for a project-management role in Go Green, in which she would manage the overall project from CDM's side. *See id.* at 2, ¶ 6.

In August 2008, Plaintiff announced her intention to take maternity leave beginning in January 2009, the approximate time that Go Green would be implemented if everything went as planned. *See id.* at 2, ¶ 7. When DuChateau made this announcement, Go Green was still in the initial planning stages. *See id.* Upon learning of DuChateau's pregnancy, one of her supervisors, Stanley Plante, expressed support but mentioned that CDM did not have a good reputation for handling maternity cases. *See* D.E. 21-1 at 82-83; D.E. 26-2 at 3, ¶ 24.

Later that month, DuChateau overheard Steve Brewer, who managed CDM's client relationship with Lockheed, tell another CDM employee on a conference call that DuChateau was "irresponsible" for getting pregnant when she was supposed to be managing the Go Green contract. *See* D.E. 19 at 2, ¶¶ 8-9; D.E. 26-2 at 1, ¶¶ 8-9. Brewer further remarked that he had done "such a hard job to sell her to" Lockheed and "now she can't manage this contract like she agreed to." *See* D.E. 19 at 2, ¶ 8; D.E. 26-2 at 1, ¶ 8.

DuChateau promptly called another of her supervisors, Phil Chernin, to complain about Brewer's comments. *See* D.E. 19 at 3, ¶ 10; D.E. 26-2 at 2, ¶ 10. She also spoke with Brewer, who

2

did not apologize for the remarks but asked DuChateau to remain on the Go Green project. *See* D.E. 19 at 3, ¶ 10; D.E. 26-2 at 2, ¶ 10. Thereafter, Brewer made no comments that DuChateau found inappropriate. *See* D.E. 19 at 3, ¶ 11; D.E. 26-2 at 2, ¶ 11. He did, however, frequently ignore e-mails from DuChateau and sometimes failed to attend scheduled meetings with her. *See* D.E. 26-2 at 2, ¶ 11. Further, although Brewer told DuChateau that she was to serve as Go Green's project manager, he did not give her access to electronic project-management tools and entered his own name into the system as project manager. *See id.*

Because of DuChateau's planned maternity leave, CDM had to re-evaluate its proposed management team for Go Green. *See* D.E. 19 at 3, ¶ 12. In September 2008, CDM hired Nancy Wheatley into its Program Management Group. *See id.* at 3, ¶ 13. Wheatley, a graduate of Massachusetts Institute of Technology, had many years of experience working on health, environmental, and safety projects in the public and private sectors. *See id.* CDM placed Wheatley into the role of project manager for Lockheed's remediation program, which included supervision of the Go Green project. *See id.* at 3, ¶ 14; D.E. 26-2 at 2, ¶ 14. Wheatley described the management structure of Go Green as "not particularly well formed" when she arrived. *See* D.E. 19 at 3-4, ¶ 14; D.E. 26-2 at 2, ¶ 14.

Upon Wheatley's arrival, it was determined that DuChateau would serve as deputy program manager for Go Green and that Tom Pedersen, a veteran CDM employee with environmental expertise, would assist with strategy development for the project. *See* D.E. 19 at 4, ¶ 15; D.E. 26-2 at 2, ¶ 15. DuChateau's role as deputy program manager was a project assignment and did not affect her compensation, benefits, or terms of employment. *See* D.E. 19 at 4, ¶ 16. Another employee in CDM's Management Consulting Division, Andrew Brady, was assigned to work with DuChateau on Go Green. *See id.* at 4, ¶ 17. Brady was being considered to serve as interim deputy program

3

manager while DuChateau was on maternity leave.  *See id.*

Throughout the fall of 2008, Wheatley, DuChateau, Pedersen, and Brady worked with Lockheed on developing Go Green.  *See* D.E. 19 at 4, ¶ 18; D.E. 26-2 at 3, ¶ 18.  Wheatley and DuChateau often disagreed on work-related issues.  *See id.*  Wheatley was concerned about DuChateau's ability to serve in a team-management role for Go Green and repeatedly criticized DuChateau for her incompetence. *See id.* According to Wheatley, Lockheed's Go Green manager, Kevin Pearson, expressed the view that DuChateau lacked "big picture perspective" and thus was not the right person to be "managing the Go Green work" for CDM.  *See* D.E. 19 at 4, ¶ 19.  DuChateau, however, believes that she was not incompetent and that CDM brought in Wheatley (as well as Pedersen) to force DuChateau off the project because of her pregnancy.  *See* D.E. 26-2 at 3, ¶¶ 18, 20.  DuChateau testified that before Wheatley joined CDM, DuChateau had worked with Lockheed on other matters and that no one had ever expressed concerns about her work product. *See* D.E. 26-2 at 2, ¶ 14; *id.* at 3, ¶ 19.  DuChateau also noted in her deposition that Pearson was the Lockheed manager "who named [DuChateau] as the person he wanted on the project."  D.E. 21-1 at 87.

On the morning of December 22, 2008, Plante informed DuChateau that she had been removed from the Go Green project.  *See* D.E. 19 at 5, ¶ 24; D.E. 26-2 at 3, ¶¶ 24-25.  Although DuChateau contends that Wheatley was the person who removed her from the project, Wheatley denies that she (or anyone else) had made a decision about DuChateau's future role in the project. *See* D.E. 19 at 5, ¶ 24; *id.* at 6, ¶ 28; D.E. 26-2 at 3, ¶ 24.  Plante told DuChateau that she should resign from the project and that other work would be found for her.  *See* D.E. 26-2 at 4, ¶ 28.[2]

---

[2]Although he was DuChateau's supervisor, Plante did not work on Lockheed projects and lacked the authority to remove DuChateau from Go Green.  *See* D.E. 19 at 5, ¶ 25; D.E. 26-2 at 3, ¶ 25.

Shortly after DuChateau's discussion with Plante, several CDM employees, including Brewer, Wheatley, and DuChateau, held a conference call regarding Go Green. *See* D.E. 19 at 5, ¶ 22. On this call, Brewer announced that Pedersen would serve as interim deputy program manager for Go Green while DuChateau was on maternity leave. *See id.* During the call, DuChateau interrupted Brewer and asked if she would be allowed to return to the project after her leave. *See id.* at 5, ¶ 23. DuChateau claims that Brewer did not respond to her question. *See* D.E. 26-1, ¶ 4. Wheatley found DuChateau's behavior on the call to be unprofessional. *See* D.E. 19 at 5, ¶ 23.

The next day, DuChateau had a scheduled phone conversation with Wheatley to discuss Go Green and DuChateau's role in the project. *See* D.E. 19 at 6, ¶ 27; D.E. 26-2 at 4, ¶ 27. Wheatley described the call as "unpleasant" and recalled DuChateau as being very upset and "ranting." *See* D.E. 19 at 6, ¶ 27. According to Wheatley, DuChateau stated that she would never work on Lockheed projects again. *See id.* at 6, ¶ 28. Wheatley therefore considered DuChateau to have resigned from the Go Green project. *See id.* For her part, DuChateau denies that she ever voluntarily removed herself from the project. *See* D.E. 26-2 at 4, ¶ 28. She recounts that during their conversation, Wheatley raised numerous issues about DuChateau's performance and repeatedly asked whether she was going to resign from Go Green. *See* D.E. 21-1 at 138-39. DuChateau responded that she already knew that Wheatley had removed her from the project. *See id.* at 139.

In a December 29, 2008, e-mail to Plante, DuChateau stated that she no longer wished to work on the Go Green project. *See* D.E. 19 at 6, ¶ 29; D.E. 26-2 at 4, ¶ 29. DuChateau notes, however, that she wrote this e-mail after Plante had informed her that she had already been removed from the project and had instructed her to resign from it. *See* D.E. 26-2 at 4, ¶ 29.

In early January 2009, DuChateau started her maternity leave. *See* D.E. 19 at 6, ¶ 29. At the same time, CDM's Management Consulting Division began experiencing a significant decrease in

its workload.  *See id.* at 6, ¶ 30.  As a result, CDM implemented layoffs, furloughs, and hour reductions for employees in that division.  *See id.*  Among those laid off was Brady, who had worked with DuChateau on Go Green and had been considered to serve as interim deputy program manager in her absence.  *See id.* at 6, ¶ 31.  Nevertheless, Pedersen, who did serve as interim deputy program manager before later being named as the permanent deputy program manager, was not laid off. *See* D.E. 21-3 at 20, 22, 24.  In addition, CDM's role in the Go Green project was substantially reduced because new management at Lockheed decided to have their own personnel perform much of the work.  *See* D.E. 19 at 7, ¶ 32.  Lockheed's original $1.6 million budget for CDM's work on the project was reduced to less than "several hundred thousand dollars."  *See id.* at 7, ¶ 33.

When her maternity leave ended in April 2009, DuChateau returned to work in the same position in CDM's Management Consulting Division.  *See id.* at 7, ¶ 34.  She maintained a normal workload, and her duties, pay, and benefits were unchanged.  *See id.* at 7, ¶ 36.  Pedersen, who was now serving as deputy program manager for Go Green, asked DuChateau if she was interested in working on what remained of that project.  *See id.* at 7, ¶ 34.  Although Pedersen claims that DuChateau declined this offer, DuChateau denies that she refused to work on the project.  *See id.* at 7, ¶ 35; D.E. 26-2 at 4, ¶ 35.  To the contrary, DuChateau testified that she agreed to help with any Lockheed work that was available but that no such work materialized.  *See* D.E. 21-1 at 119-20, 133, 210; D.E. 26-2 at 3, ¶ 19.

In June 2009, as a result of the overall slowdown in work in her division, DuChateau's weekly hours were reduced from 40 to 32, and later from 32 to 24.  *See* D.E. 19 at 7-8, ¶¶ 36, 37; D.E. 26-2 at 4, ¶ 30.  Soon thereafter, DuChateau received a job offer from one of CDM's competitors, for which she had previously worked before joining CDM.  *See* D.E. 19 at 8, ¶¶ 38, 39. After receiving this offer, DuChateau contacted Plante and asked if CDM was conducting voluntary

layoffs of employees. *See id.* at 8, ¶ 40. DuChateau and Plante discussed her situation, and they mutually agreed that she would be laid off so that she could receive a severance payment. *See id.* at 8, ¶ 41. DuChateau was subsequently laid off and received a severance payment that she considered to be "very fair." *See id.* at 8, ¶ 42. One week later, DuChateau began working in her new job; although her initial annual salary was about $10,000 less than what she made at CDM, the difference is now about $5,000. *See id.* at 8, ¶ 43; D.E. 26-2 at 5, ¶ 43.

## II. Procedural History

On April 15, 2010, DuChateau filed a Complaint against CDM in Broward County Circuit Court. *See* D.E. 1 at 14-19. DuChateau's Complaint alleges that CDM (1) discriminated against her because of her pregnancy and planned maternity leave, in violation of the Florida Civil Rights Act of 1992 ("FCRA"), *see* Fla. Stat. §§ 760.01–760.11; (2) interfered with her rights under the Family and Medical Leave Act ("FMLA"), *see* 29 U.S.C. §§ 2601–2654; and (3) retaliated against her for exercising her FMLA rights. *See* D.E. 1 at 16-17. On May 5, 2010, CDM removed DuChateau's action to this Court. *See* D.E. 1 at 1-9. CDM subsequently filed an Answer to DuChateau's Complaint. *See* D.E. 4.

Following discovery, CDM filed its present Motion for Summary Judgment. *See* D.E. 20. DuChateau has filed a Response to the Motion, and CDM has filed a Reply. *See* D.E. 26; D.E. 33. The parties have also submitted declarations and deposition transcripts of various witnesses, namely, DuChateau, Wheatley, Pedersen, and Plante. *See* D.E. 21; D.E. 22; D.E. 26-1. With the parties' consent, Judge Zloch has referred this case to me for all further proceedings and the entry of judgment. *See* D.E. 38 at 1.

### III.    Analysis

#### A.    Summary Judgment Standard

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Not any factual dispute will defeat a motion for summary judgment; rather, "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986) (emphasis in original).   A dispute is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (citing *Anderson*, 477 U.S. at 247-48).   A fact is material if "it would affect the outcome of the suit under the governing law ." *Id.* (citing *Anderson*, 477 U.S. at 247-48).

In deciding a summary judgment motion, the Court views the facts in the light most favorable to the non-moving party—here, DuChateau—and draws all reasonable inferences in her favor. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006).   Further, the Court does not weigh conflicting evidence. *See Skop v. City of Atlanta*, 485 F.3d 1130, 1140 (11th Cir. 2007).   Thus, upon discovering a genuine dispute of material fact, the Court must deny summary judgment.   *See id.*

The moving party bears the initial burden of showing the absence of a genuine dispute of material fact.   *See Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008) (per curiam).   Once the moving party satisfies this burden, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'"   *Ray v. Equifax Info. Servs., LLC*, 327 F. App'x 819, 825 (11th Cir. 2009) (per curiam) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).   Instead, "[t]he non-moving party must make a sufficient showing on each essential element of the case for which he has the burden of proof." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).   Accordingly, the non-moving party must

produce evidence, going beyond the pleadings, to show that a reasonable jury could find in his favor. *See Shiver*, 549 F.3d at 1343.

> **B.      FCRA Pregnancy Discrimination Claim**

As noted above, DuChateau asserts a claim for pregnancy discrimination under the FCRA. In its Motion for Summary Judgment, CDM argues that the FCRA does not recognize a cause of action for pregnancy discrimination and therefore that DuChateau's FCRA claim must fail. DuChateau disagrees, noting that in *Carsillo v. City of Lake Worth*, 995 So. 2d 1118, 1120-21 (Fla. 4th DCA 2008), Florida's Fourth District Court of Appeal held that the FCRA recognizes and prohibits pregnancy discrimination as a form of sex discrimination.  The Court agrees with CDM and grants its Motion for Summary Judgment on this claim.

In evaluating CDM's argument, the Court must look to Florida law.  *See CSX Transp., Inc. v. Trism Specialized Carriers, Inc.*, 182 F.3d 788, 791 (11th Cir. 1999).  First, the Court considers rulings of the Florida Supreme Court.  *See Bailey v. S. Pac. Transp. Co.*, 613 F.2d 1385, 1388 (5th Cir. 1980).[3]  When the state's highest court has rendered no decisions on point, however, this Court must follow the opinions of Florida's intermediate courts unless it is "convinced that the highest court would decide otherwise."  *Id.* (citing *Comm'r v. Bosch*, 387 U.S. 456, 465 (1967)).

In this case, the Florida Supreme Court has not construed the FCRA for the purpose of determining whether the statute renders pregnancy discrimination illegal.  *See Wahl v. Seacoast Banking Corp. of Fla.*, 2011 WL 861129, at *12 (S.D. Fla. Mar. 9, 2011) ("The issue of coverage for pregnancy discrimination under the FCRA has not been finally resolved by the Supreme Court of Florida.").  And, while two Florida intermediate courts of appeal have issued decisions regarding

---

[3]Opinions of the Fifth Circuit issued prior to October 1, 1981, are binding precedent in the Eleventh Circuit.  *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

whether the FCRA bans pregnancy discrimination, they have arrived at opposite conclusions.

In *O'Loughlin v. Pinchback*, 579 So. 2d 788, 791-92 (Fla. 1st DCA 1991), the First District Court of Appeal found that the FCRA does not protect against pregnancy discrimination. Although the First District recognized that the FCRA is patterned after Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e-2, and further, that Title VII currently prohibits pregnancy discrimination, the court noted that in 1976, in *General Electric Co. v. Gilbert*, 429 U.S. 125 (1976), the United States Supreme Court construed the language appearing at that time in Title VII as not prohibiting pregnancy discrimination. *See O'Loughlin*, 579 So. 2d at 791. Consequently, the *O'Loughlin* court noted, Congress amended Title VII with the Pregnancy Discrimination Act of 1978, 42 U.S.C. § 2000e(k) ("PDA"). *See id.* Since the operative language in Title VII making sex discrimination illegal at the time the Supreme Court decided *Gilbert* was, in relevant part, the same as the language in the FCRA's predecessor statute (the Florida Human Relations Act, subsequently re-named the Florida Human Rights Act, before being re-named yet again as the FCRA), the First District reasoned that the FCRA's predecessor statute had to be read as not covering pregnancy discrimination. *See id.* Further, the court found that Florida's failure to amend the FCRA's predecessor statute to prohibit pregnancy discrimination following the Supreme Court's decision in *Gilbert* and Congress's enactment of the PDA indicated that the FCRA's predecessor statute continued not to prohibit pregnancy discrimination.[4] *See id.* at 791-92.

------

[4]While this Court is aware that some courts have construed *O'Loughlin* to find that the FCRA authorizes a cause of action for pregnancy discrimination, *see, e.g.*, *Jolley v. Phillips Educ. Grp. of Cent. Fla., Inc.*, 1996 WL 529202, at *6 (M.D. Fla. July 3, 1996), this Court respectfully disagrees with that analysis and instead adopts the interpretation of *O'Loughlin* set forth by the Middle District of Florida in *Boone v. Total Renal Laboratories, Inc.*, 565 F. Supp. 2d 1323, 1326-27 (M.D. Fla. 2008):

> *O'Loughlin* did not find that the FHRA prohibited pregnancy discrimination; it held that the FHRA did not cover pregnancy discrimination and therefore was preempted

Seventeen years after the First District Court of Appeal decided *O'Loughlin*, the Fourth District Court of Appeal reached the opposite conclusion in *Carsillo v. City of Lake Worth*, 995 So. 2d 1118 (Fla. 4th DCA 2008). In arriving at this determination, the Fourth District began from the same starting point as the First District—noting that the FCRA and its predecessor statute had been "patterned after" Title VII, and thus, "will be given the same construction as the federal statute." *Id.* at 1121. The Fourth District parted ways with the First District, however, when it considered the effect of *Gilbert* and Congress's enactment of the PDA on interpretation of the FCRA. Noting that when Congress enacted the PDA, it "expressed its disapproval of both the holding and the reasoning of *Gilbert*," the Fourth District concluded that "Congress made clear in 1978 that its intent in the original enactment of Title VII in 1964 was to prohibit discrimination based on pregnancy as sex discrimination." *Id.* at 1119-20. Because the FCRA is patterned after Title VII, the Fourth District reasoned, "it follows that the sex discrimination prohibited in Florida since 1972 included discrimination based on pregnancy," and it was not necessary for the Florida legislature to amend the FCRA after *Gilbert* to achieve this construction. *Id.* at 1121; *see id.* at 1120.

Federal courts considering whether the FCRA bars pregnancy discrimination have come down on both sides of the issue. *Compare, e.g., Boone v. Total Renal Labs., Inc.*, 565 F. Supp. 2d 1323, 1326-27 (M.D. Fla. 2008) (holding that the FCRA does not provide a claim for pregnancy

---

by Title VII. In other words, the court allowed the [pregnancy-discrimination] claim to proceed as a Title VII claim rather than an FHRA claim. . . . [T]o the extent that *O'Loughlin* recognized a pregnancy-discrimination cause of action based on the "preemptive" effect of Title VII, the First District Court of Appeal's holding on preemption is not binding on federal courts. . . . [T]his Court disagrees that the FHRA or the FCRA "conflict with" or undermine Title VII such that they are preempted. . . . Title VII is not undercut or diminished by the existence of the FCRA's lesser protections. Florida citizens may still bring suit under Title VII unfettered by the FCRA's provisions, but the FCRA does not provide a pregnancy-discrimination cause of action of its own.

discrimination), *Whiteman v. Cingular Wireless, LLC*, Case No. 04-80389-CIV-PAINE, D.E. 114 at 11 (S.D. Fla. May 3, 2006) (same), *aff'd*, 273 F. App'x 841 (11th Cir. 2008) (per curiam), *and Frazier v. T-Mobile USA, Inc.*, 495 F. Supp. 2d 1185, 1187 (M.D. Fla. 2003) (same), *with Constable v. Agilysys, Inc.*, 2011 WL 2446605, at *6 (M.D. Fla. June 15, 2011) (concluding that the FCRA does provide a cause of action for pregnancy discrimination), *and Terry v. Real Talent, Inc.*, 2009 WL 3494476, at *2 (M.D. Fla. Oct. 27, 2009) (same). This Court finds itself in agreement with the courts concluding that the FCRA does not prohibit pregnancy discrimination.

In reaching this decision, the Court finds highly relevant the chronology of events occurring in the passage and amendment of what are now the current versions of Title VII and the FCRA. Thus, the Court begins by recognizing that Congress enacted Title VII in 1964. In that iteration of the statute, it was an unlawful employment practice "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e (1964).

Five years later, the Florida legislature passed the Florida Human Relations Act, Ch. 69-287, Laws of Fla. (July 1, 1969). This version of the Florida Human Relations Act prohibited discrimination based on "race, color, religion, or national origin." *Id.* In 1972, however, the Florida legislature amended the Florida Human Relations Act to ensure "freedom from discrimination because of sex." Fla. Law 72-48. In this regard, the legislature changed the definition of "discriminatory practice" to mean "any unfair treatment based on race, color, religion, sex or national origin." *Id.*

Then, in 1976, the Supreme Court issued its ruling in *Gilbert*, finding that Title VII, as written at that time, provided no protection against pregnancy discrimination. *See Gilbert*, 429 U.S.

125.  At that point, it was clear that, as a matter of law, Title VII as it then existed did not prohibit pregnancy discrimination.  Similarly, because Florida law provides that a Florida statute patterned after a federal law will be given the same construction as the federal courts give the federal act, it was equally clear after the Supreme Court decided *Gilbert* that the similar language in the Florida Human Relations Act prohibiting sex discrimination did not suffice to make pregnancy discrimination illegal.

The following year, Florida again amended the Florida Human Relations Act, changing, among other aspects of the statute, its name to the Florida Human Rights Act ("FHRA").  *See* Fla. Law 77-341.  In addition, the 1977 amendment expanded the protections of the FHRA to preclude discrimination on the basis of age, handicap, or marital status.  *See id.*  Despite making these changes to the FHRA, the Florida legislature chose to make no modification to the language of the FHRA prohibiting discrimination on the basis of sex, even though the Supreme Court had, one year earlier, construed the federal equivalent as not encompassing pregnancy discrimination.  "When the legislature reenacts a statute which has a judicial construction placed upon it, it is presumed that the legislature is aware of the construction and intends to adopt it, absent a clear expression to the contrary."  *Gulfstream Park Racing Ass'n, Inc. v. Dep't of Bus. Reg.*, 441 So. 2d 627, 628 (Fla. 1983).  At that point in time, then, the FHRA continued to provide no cause of action for pregnancy discrimination.

The next year, in 1978, Congress enacted the PDA, amending Title VII to preclude pregnancy discrimination by re-defining sex discrimination to include discrimination on the basis of pregnancy.  *See* 42 U.S.C. § 2000e(k).  In this regard, the PDA prohibits discrimination on the basis of "pregnancy, childbirth, or related medical conditions."  *Id.*  It further provides that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-

related purposes . . . as other persons not so affected but similar in their ability or inability to work."
*Id.*  As the Fourth District Court of Appeal noted in *Carsillo*, the legislative history of the PDA indicates that Congress passed the law in response to *Gilbert*.  *See Carsillo*, 995 So. 2d at 1119 (citing *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669 (1983)).

Florida did not amend the FHRA in the years following Congress's enactment of the PDA. Therefore, it is not surprising that in 1991, the First District Court of Appeal in *O'Loughlin* concluded that the FHRA, which continued to prohibit discrimination on the basis of sex, as had the pre-PDA version of Title VII, provided no protection against pregnancy discrimination. *See O'Loughlin*, 579 So. 2d at 791-92.

The following year, in 1992, the Florida legislature enacted Florida Law Chapter 92-177. Among other modifications, this law changed the name of the FHRA to the Florida Civil Rights Act of 1992.  *See* Fla. L. Ch. 92-177.  But in contrast to the PDA, and despite the First District's construction of the FHRA just one year earlier as not precluding pregnancy discrimination, the amendments to the FCRA did not modify in any way the statute's references to sex discrimination or otherwise suggest an intention that the statutory language prohibiting discrimination on the basis of sex be read to proscribe discrimination on the basis of pregnancy.  Indeed, the language of the FCRA prohibiting discrimination on the basis of sex continued to include the pre-PDA language of Title VII.

In sum, based on the language and history of the statute, the Court concludes that the FCRA does not prohibit pregnancy discrimination.  Accordingly, the Court grants CDM's Motion for Summary Judgment with respect to DuChateau's FCRA claim.

### C.     FMLA Claims

As relevant here, the FMLA entitles an eligible employee to twelve weeks of unpaid leave in any one-year period "[b]ecause of the birth of a son or daughter of the employee and in order to care for such son or daughter."  29 U.S.C. § 2612(a)(1)(A).  Moreover, when the employee returns from such leave, the employer must restore her to "the position of employment held by the employee when the leave commenced" or to "an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment."  29 U.S.C. § 2614(a)(1).  In connection with these rights, the FMLA creates two types of claims:  (1) interference claims, in which the employee asserts that his employer denied or otherwise interfered with his substantive FMLA rights, and (2) retaliation claims, in which the employee contends that her employer discriminated against her because she engaged in FMLA-protected activity.  *See* 29 U.S.C. § 2615(a)(1), (2); *Strickland v. Water Works & Sewer Bd. of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001).  Here, DuChateau alleges both types of claims, which the Court analyzes in turn.

### 1.     Interference Claim

To prove a claim for FMLA interference, "an employee must demonstrate that he was denied a benefit to which he was entitled under the FMLA."  *Martin v. Brevard Cnty. Pub. Schs.*, 543 F.3d 1261, 1266-67 (11th Cir. 2008) (per curiam).  The employee need not allege that his employer intended to deny the right.  *See Strickland*, 239 F.3d at 1208.  In this case, DuChateau claims that CDM failed to restore her to the same position or an equivalent position when she returned from maternity leave.  *See* 29 U.S.C. § 2614(a)(1); D.E. 1 at 16-17; D.E. 21-1 at 117; D.E. 26 at 16-17.  The record, however, refutes this claim.

DuChateau concedes that when her maternity leave ended in April 2009, she returned to work in the same position that she had held in CDM's Management Consulting Division before her leave,

with the same job duties, pay, and benefits. *See* D.E. 19 at 7, ¶¶ 34, 36; D.E. 21-1 at 147 (deposition testimony by DuChateau that when she returned from leave, "the work was the same" and her pay was unchanged). Nonetheless, DuChateau argues that CDM removed her from the Go Green project just before her leave began and kept her off that project when she returned. This argument fails, though, because DuChateau's role as deputy program manager of Go Green was not an employment position; it was a project assignment that had no effect on her compensation, benefits, or terms of employment. *See* D.E. 19 at 4, ¶ 16; *cf.* 29 C.F.R. § 825.215(f) ("The requirement that an employee be restored to the same or equivalent job with the same or equivalent pay, benefits, and terms and conditions of employment does not extend to de minimis, intangible, or unmeasurable aspects of the job."); *Breeden v. Novartis Pharm. Corp.*, 684 F. Supp. 2d 58, 61 (D.D.C. 2010) (holding that a salesperson who was reassigned to a smaller and less lucrative sales territory after she took maternity leave could not maintain an FMLA interference claim because she had shown "only *de minimis* differences between her new job and her old one"), *aff'd*, 646 F.3d 43 (D.C. Cir. 2011). Indeed, DuChateau maintained a normal workload on other projects for about two months after she returned from leave; it was not until June 2009 that her hours were reduced. *See* D.E. 19 at 7-8, ¶¶ 36-37. Because the record shows conclusively that CDM restored DuChateau to the same position after her maternity leave, CDM is entitled to summary judgment on DuChateau's FMLA interference claim.

### 2. Retaliation Claim

An employee alleging an FMLA retaliation claim must prove that "his employer *intentionally* discriminated against him for exercising an FMLA right." *Martin*, 543 F.3d at 1267 (emphasis in original). The plaintiff therefore "faces the increased burden of showing that his employer's actions were motivated by an impermissible retaliatory or discriminatory animus." *Strickland*, 239 F.3d at 1207 (internal quotation marks omitted). As with her interference claim, DuChateau contends that

CDM retaliated against her for taking FMLA leave by removing her as deputy program manager for Go Green shortly before her planned leave and keeping her off the project after she returned. *See* D.E. 1 at 17; D.E. 26 at 16-17.

When, as here, an employee asserts an FMLA retaliation claim without direct evidence of the employer's retaliatory intent, the Court applies the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006).[5] Under this framework, the plaintiff must first establish a *prima facie* case of retaliation by showing that (1) she engaged in statutorily protected activity, (2) she suffered an adverse employment action, and (3) a causal connection exists between the protected activity and the adverse employment action. *See id.* If the plaintiff demonstrates a *prima facie* case, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action. *See id.* If the employer does so, then the plaintiff must show

---

[5]DuChateau argues that Brewer's statements on the conference call in late August 2008—namely, that DuChateau was "irresponsible" for getting pregnant when she was supposed to be managing the Go Green contract, that Brewer had done "such a hard job to sell her to" Lockheed, and that "now she can't manage this contract like she agreed to"—are direct evidence of discriminatory or retaliatory intent. The Court disagrees. The Eleventh Circuit "defines direct evidence of discrimination as evidence which reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004) (internal quotation marks omitted). The court of appeals has emphasized that "only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination." *Id.* (internal quotation marks omitted). Thus, "[i]f the alleged statement suggests, but does not prove, a discriminatory motive, then it is circumstantial evidence." *Id.* Here, the remarks by Brewer—who managed CDM's client relationship with Lockheed and oversaw the Go Green project—indicate that he was displeased with DuChateau's pregnancy and planned maternity leave because he felt that those events would prevent her from managing the Go Green project. DuChateau, however, does not challenge CDM's decision to bring in another person (Wheatley) to manage the project. Rather, DuChateau claims that CDM's retaliation consisted of taking away her supporting role as deputy program manager. While Brewer's comments may provide circumstantial support for DuChateau's claim, they do not unambiguously show that CDM removed DuChateau from her role in Go Green because of her decision to take FMLA-protected leave.

that the employer's proffered reason for the adverse action is pretextual. *See id.*

### a. *Prima Facie* Case

Regarding the elements of DuChateau's *prima facie* case, CDM does not dispute that DuChateau engaged in FMLA-protected conduct by taking maternity leave. *See* 29 U.S.C. § 2612(a)(1)(A). CDM argues, however, that the record conclusively shows that DuChateau did not suffer an adverse employment action and that no causal connection exists between her FMLA leave and any adverse action. The Court disagrees and finds that DuChateau has established a triable issue of fact on these elements.

### (1) Adverse Action

CDM asserts that DuChateau's departure from Go Green was not an adverse employment action because (1) she voluntarily left the project and (2) even if CDM removed her, "there was no change in her job position, pay, duties or benefits." D.E. 20 at 16. In support of its first argument, CDM claims that on three occasions, DuChateau stated that she would no longer work on Go Green: during her December 23, 2008, phone conversation with Wheatley; in her December 29, 2008, e-mail to Plante; and in a conversation with Pedersen after she returned from leave. The record, though, presents a factual dispute on this issue. DuChateau denies telling Wheatley or Pedersen that she no longer wished to work on Go Green. And while DuChateau acknowledges the statement in her e-mail to Plante, she points out that she wrote it only after Plante had informed her that she had already been removed from the project and had instructed her resign from it. Viewing this evidence in the light most favorable to DuChateau, a reasonable jury could find that she never voluntarily left Go Green and that CDM removed her from the project.

With respect to CDM's second argument, the Supreme Court has held that Title VII's anti-retaliation provision—which closely tracks the relevant FMLA provision—"is not limited to

discriminatory actions that affect the terms and conditions of employment." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006). Construing that provision to "provide broad protection from retaliation," the Court "reject[ed]" other interpretations that "limited actionable retaliation to so-called 'ultimate employment decisions.'" *Id.* at 67. Instead, the Court concluded that a retaliation plaintiff "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (internal quotation marks omitted). While noting that this "material adversity" standard excludes "trivial harms," the Court explained that "the significance of any given act of retaliation will often depend upon the particular circumstances." *Id.* at 68-69. Applying these principles to the case before it, the Court rejected the defendant employer's argument that "a reassignment of duties cannot constitute retaliatory discrimination where, as here, both the former and present duties fall within the same job description." *Id.* at 70. Although "reassignment of job duties is not automatically actionable," the Court observed, "[w]hether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Id.* at 71 (internal quotation marks omitted).

The Eleventh Circuit has assumed, without deciding, that the "material adversity" standard of *Burlington Northern* applies to retaliation claims under the FMLA. *See Foshee v. Ascension Health-IS, Inc.*, 384 F. App'x 890, 891-92 (11th Cir. 2010) (per curiam); *see also Quinn v. St. Louis Cnty.*, __ F.3d __, 2011 WL 3890319, at *5 n.9 (8th Cir. Sept. 6, 2011) ("Every circuit that has addressed the issue has held that [*Burlington Northern*'s] 'materially adverse' standard for Title VII retaliation claims applies to FMLA retaliation claims." (citations omitted)). Moreover, the court of appeals has interpreted *Burlington Northern* as "strongly suggest[ing] that it is for a jury to decide

whether anything more than the most petty and trivial actions against an employee should be considered 'materially adverse' to him and thus constitute adverse employment actions." *Crawford v. Carroll*, 529 F.3d 961, 973 n.13 (11th Cir. 2008) (citing *Burlington Northern*, 548 U.S. at 71-73).

As discussed above in connection with DuChateau's interference claim, her removal from the Go Green project did not affect her core job duties or otherwise change the terms and conditions of her employment with CDM.  For purposes of her retaliation claim, however, the Court concludes that DuChateau has presented sufficient evidence to create a triable issue on whether her loss of the Go Green project assignment was a materially adverse employment action.  *See Breeden*, 684 F. Supp. 2d at 62 (explaining that "adverse action" in the context of an FMLA retaliation claim "reaches more broadly" than the statute's requirements for restoring an employee to the same or an equivalent position following leave).  DuChateau had invested significant time and effort helping plan the project, and she expected that it would fill most of her time during 2009.  *See* D.E. 21-1 at 132.  But due to CDM's alleged decision to remove her from Go Green, she lost the opportunity for the sustained work that the project would have provided.[6]  *See id.* at 117.  And though she did work on other projects after returning from leave, that work eventually slowed to the point that her hours were substantially reduced.  *See* D.E. 19 at 7-8, ¶¶ 36, 37; D.E. 26-2 at 4, ¶ 30.  Further, DuChateau's removal from the project was allegedly related to Wheatley's criticisms that DuChateau was incompetent and poorly suited for her role in the project—views that DuChateau claims were wholly unjustified.  A jury could reasonably conclude that an employee faced with the prospect of these

---

[6]Although CDM's role in Go Green was scaled back significantly in early 2009, the record shows that CDM continued to perform substantial work on the project. In particular, Pedersen—who replaced DuChateau as deputy program manager—continued to work on Go Green and related projects in 2009 and thereafter.  *See* D.E. 21-3 at 24.  Viewing this evidence in the light most favorable to DuChateau, a jury could reasonably find that DuChateau's loss of her project assignment on Go Green deprived of work that would have prevented, or at least delayed, the reduction in her hours.

negative events would have been deterred from taking FMLA-protected leave. *See Breneisen v. Motorola, Inc.*, 512 F.3d 972, 979 (7th Cir. 2008) (explaining that materially adverse actions "include any actions that would dissuade a reasonable employee from exercising his rights under the FMLA" (citing *Burlington Northern*, 548 U.S. at 57)).

### (2)    Causation

CDM further argues that no causal connection exists between DuChateau's FMLA leave and any adverse employment action. "To establish the causal connection element, a plaintiff need only show that the protected activity and the adverse action were not wholly unrelated." *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) (internal quotation marks omitted). In order to make this showing, the plaintiff must present evidence that "the decision maker was aware of the protected conduct at the time of the adverse employment action." *Id.* Assuming such evidence exists, "close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection." *Id.*

It is undisputed that the relevant decision-makers at CDM—including Wheatley, Brewer, and all of DuChateau's supervisors—knew of DuChateau's planned maternity leave when she was allegedly removed from the Go Green project. Further, the record reflects a close temporal proximity between these events. DuChateau claims that just over a week before she left for maternity leave, Plante informed her that she had been removed from Go Green and instructed her to resign from the project. *See Lawson v. Plantation Gen. Hosp.*, 704 F. Supp. 2d 1254, 1271 (S.D. Fla. 2010) (describing two-week proximity between FMLA leave and adverse employment action as "extremely close"). This evidence is sufficient to create a genuine dispute of material fact regarding a causal connection between DuChateau's FMLA-protected conduct and her loss of the

Go Green assignment.

### b.   Legitimate Reason

As noted above, when a plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the employer to present evidence of a legitimate, non-retaliatory reason for the challenged employment action. *See Hurlbert*, 439 F.3d at 1297. The employer's burden is "exceedingly light." *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994) (internal quotation marks omitted). As long as the employer "articulates a clear and reasonably specific non-discriminatory basis for its actions," it has met its burden of production. *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 770 (11th Cir. 2005) (per curiam) (internal quotation marks omitted).

Here, CDM indicates that DuChateau was removed from the Go Green project because Wheatley and Lockheed's management team "had issues with the prospect of [DuChateau] serving in a leadership role on Go Green." D.E. 20 at 14. As discussed above in Part I, during the fall of 2008, Wheatley repeatedly criticized DuChateau for her incompetence and expressed concerns about DuChateau serving in a team-management role for Go Green. Wheatley also testified that Pearson (Lockheed's Go Green manager) had voiced similar concerns about DuChateau's work on the project. The Court finds that CDM's proffered reason for removing DuChateau from Go Green—alleged deficiencies in her performance—satisfies CDM's minimal burden of production.

### c.   Pretext

Because CDM has provided a legitimate, non-retaliatory reason for its actions, the burden shifts back to DuChateau to demonstrate that this reason is merely a pretext for retaliation. *See Hurlbert*, 439 F.3d at 1297. To make this showing, a plaintiff must present evidence "sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Id.* at 1298 (internal quotation marks omitted). The

plaintiff may do so "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (internal quotation marks omitted).   In the latter case, the plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (internal quotation marks omitted).

DuChateau disputes Wheatley's claim that she was incompetent, asserting that this was merely an excuse for CDM to force DuChateau off the Go Green project because of her pregnancy. CDM responds that DuChateau "cannot establish pretext by merely questioning the wisdom of the employer's criticism where such feedback might motivate a reasonable employer."  D.E. 20 at 15 (citing *Combs*, 106 F.3d at 1543).   The Court concludes, however, that DuChateau has offered sufficient evidence to allow a reasonable jury to discredit CDM's allegations of poor performance.

First, DuChateau testified that before Wheatley joined CDM, DuChateau had worked with Lockheed on other matters and no one had ever expressed concerns about her work product.  Second, DuChateau testified that Pearson, who Wheatley claims disapproved of DuChateau's management role in Go Green, was the Lockheed manager "who named [DuChateau] as the person he wanted on the project."  D.E. 21-1 at 87.  Third, DuChateau offered specific examples of incidents in which Wheatley allegedly trumped up criticism of DuChateau.  For example, DuChateau testified that Wheatley criticized her for failing to make certain revisions to a document when, in fact, DuChateau had revised the document as Wheatley had directed.  *See* D.E. 21-1 at 111-12.  According to DuChateau's deposition, Wheatley's comments made clear that she had never even looked at the

revised document.  *See id.*

Finally, a reasonable jury could find that Brewer's comments about DuChateau on the August 2008 conference call further undermine CDM's claim that DuChateau was removed from Go Green for performance reasons.  Brewer complained that DuChateau was "irresponsible" for getting pregnant when she was supposed to be managing the Go Green contract, that Brewer had done "such a hard job to sell her to" Lockheed, and that "now she can't manage this contract like she agreed to."  These remarks, reflecting Brewer's disapproval of DuChateau's pregnancy and planned maternity leave as they related to Go Green, provide circumstantial support for DuChateau's claim that CDM took away her project assignment because she chose to exercise her FMLA rights.

Typically, a plaintiff who establishes a *prima facie* case and sets forth sufficient evidence to allow a factfinder to disbelieve an employer's proffered explanation for its actions creates a jury question on the ultimate issue of discrimination or retaliation.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000).  Here, especially given the requirement that the Court view the evidence in the light most favorable to DuChateau, the Court finds that DuChateau has presented enough evidence to establish a triable issue on whether CDM retaliated against her for taking FMLA-protected leave.  The Court therefore denies CDM's Motion for Summary Judgment with respect to DuChateau's FMLA retaliation claim.

## IV.    Conclusion

For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** that Defendant's Motion for Final Summary Judgment [D.E. 20] is **GRANTED IN PART** and **DENIED IN PART.** Defendant's Motion for Summary Judgment is **GRANTED** with regard to Plaintiff's FCRA pregnancy discrimination claim and her FMLA interference claim.  Defendant's Motion for Summary Judgment is **DENIED** with respect to Plaintiff's FMLA retaliation claim.

**DONE** and **ORDERED** at Fort Lauderdale, Florida, this 4th day of October, 2011.

_____

ROBIN S. ROSENBAUM

United States Magistrate Judge

cc:    Counsel of record